1  Joe Shaeffer, WSBA #33273
   MacDonald Hoague & Bayless
2  705 Second Avenue, Suite 1500
   Seattle, WA 98104-1754
3  206-622-1604

4  Katherine M. Forster, CA Bar #217609
   Munger Tolles & Olson LLP
5  350 South Grand Avenue, 50th Floor
   Los Angeles, CA 90071
   (213) 683-9538

6

7                    UNITED STATES DISTRICT COURT

8           EASTERN DISTRICT OF WASHINGTON AT RICHLAND

9

10 JOHN DOE 1; JOHN DOE 2; JANE          No.
   DOE 1; JANE DOE 2; JANE DOE 3; and
   all persons similarly situated,
11
              Plaintiffs,
12
         v.                              DECLARATION OF
                                         KATHLEEN DENNEHY-FAY
13 WASHINGTON STATE                      IN SUPPORT OF
   DEPARTMENT OF CORRECTIONS;            PLAINTIFFS' MOTION FOR
14 STEPHEN SINCLAIR, Secretary of the    PRELIMINARY INJUNCTIVE
   Department of Corrections, in his official  RELIEF
15 capacity,

              Defendant,
16
         and
17

18 BONNEVILLE INTERNATIONAL,
   INC. a Utah Corporation, d.b.a. KIRO
19 Radio 97.3 FM; THE MCCLATCHY
   COMPANY, LLC, a California Limited
20 Liability Company, d.b.a. The Tacoma
   News Tribune; and ANDREA KELLY,
   individual,
21
              Interested Parties.
22

23       I, Kathleen Dennehy-Fay, declare and state as follows:

Dennehy Decl. - 1

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
P.O. Box 2728
SEATTLE, WA 98111
(206) 624-2184

1.    I have a Ph. D. and a Master's in Social Policy from the Heller School for Social Policy and Management of Brandeis University in Waltham, Massachusetts. My Ph.D concentration was Behavioral Health and my academic focus was developing and implementing policies to eliminate sexual abuse in custodial settings. I also have a Master's in Public Administration from Suffolk University and a B.A. from Wheaton College, Norton, Massachusetts.

2.    I have over forty years of experience working in, or consulting with criminal justice agencies. I currently serve as the Independent Court Monitor of the Settlement Agreement between the United States Department of Justice, the State of Alabama, and the Alabama Department of Corrections resolving the United States' finding of unconstitutional conditions of confinement of women prisoners at the Julia Tutwiler Prison for Women due to sexual abuse and sexual harassment. I also provide technical assistance in support in the development of gender-responsive and trauma-informed policy, practice and programs at the Julia Tutwiler Prison for Women. I also currently serve as an expert in correctional policies and practices.

3.    Between 2010 and 2016 I provided technical assistance as a Senior Program Specialist to the National Resource Center for the Elimination of Prison Rape, also known as the National PREA Resource Center, named after the Prison

Dennehy Decl. - 2

Rape Elimination Act (PREA). I was employed as a Senior Program Specialist by the National Council on Crime and Delinquency which operated under a cooperative agreement with the United States Department of Justice Bureau of Justice Assistance. In this role I provided coaching support to the Department of Justice PREA demonstration grant sites, assisted in the development of PREA grant award performance measures, and participated as a faculty member for the DOJ-certified PREA Auditor training program.

4.     I have worked in the corrections field since 1976. For nearly thirty years, from the time I graduated from college in 1976 to 2003 I rose through the civilian ranks of the Massachusetts Department of Correction, serving in various supervisory positions at maximum and medium security facilities for men, and the Central Office. For thirteen of those years, I was a member of the executive staff in my roles as Associate, Deputy, and Acting Commissioner. In my roles as Associate and Deputy Commissioner, I provided oversight of inmate medical and mental healthcare, monitored statewide compliance with various contracts, achieved accreditation of various facilities, provided oversight of inmate programming and treatment, implemented priority projects and strategic planning for the agency, and managed many other responsibilities as a member of the executive staff who was third and then second in command of the agency.

Dennehy Decl. - 3

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
P.O. Box 2728
SEATTLE, WA 98111
(206) 624-2184

5.      I was appointed as Acting Commissioner, after a high-profile incident, and was responsible for developing a plan to lead and sustain organizational culture change, enhance agency transparency, and establish accountability at the agency. I was then appointed Commissioner in 2004 and held that position until 2007. As the Commissioner I was the Chief Executive Officer of the agency and responsible for the overall management, safety, care, and custody of over 11,000 inmates. During my time as Commissioner, I achieved system-wide accreditation status by the American Correctional Association and led the implementation of the Governor's Commission on Corrections Reform recommendations, which included the development of new inmate classification, disciplinary, grievance and investigations systems. After my time working for the Massachusetts Department of Correction, I was Chief Operations Officer for the overall security of six correctional facilities at the Bristol County Jail and House of Correction in New Bedford, Massachusetts. I retired from Massachusetts public service in 2008.

6.      Because of my years of experience working in the criminal justice system, I have also worked as an independent consultant in the field since 1996. Much of my experience and work as a consultant support my qualifications as an expert in the field of policy analysis and implementation, staff training, correctional administration, investigations, and staff sexual misconduct relating to correctional

Dennehy Decl. - 4

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
P.O. BOX 2728
SEATTLE, WA 98111
(206) 624-2184

facilities. For example, I have been contracted by the Department of Justice and Impact Justice to conduct peer review of competitive grant applications regarding PREA programming. I have conducted reviews, evaluations, provided feedback on program documents, and developed curriculum for organizations like Just Detention International and the Criminal Justice Institute. I have contracted as an expert witness for the California Department of Justice in litigation against the California Department of Corrections and Rehabilitation. I have developed and instructed training modules on Investigating Prison Sexual Assault and operational practice and have provided technical assistance in the development of policy guides for correctional agencies through the Project on Addressing Prison Rape at American University, Washington College of Law. I have provided subject matter expertise and editorial support to the National Prison Rape Elimination Commission through Vera Institute of Justice as they drafted national standards to prevent, detect, and respond to prison-based sexual abuse and participated as a subject matter expert at an LGBTI Policy Guide Development Meeting through the National Institute of Corrections in Washington, D.C.

7.     My experience and expertise have also led me to opportunities in presenting on panels discussing the criminal justice system before the Massachusetts Legislature, Harvard Medical School, and the Massachusetts Health

Dennehy Decl. - 5

Policy Forum, among other organizations. I have also presented or participated in discussions regarding prison safety, sexual abuse, and PREA at Boston College Law School, Just Detention International, the Pennsylvania Department of Corrections, and Massachusetts Prisoner Legal Assistance.

8.      My writing has been published in journals such as the New England Journal on Criminal Civil Confinement and Corrections Today, books such as Criminal Justice Organizations: Administration and Management[1], and forums such as the Massachusetts Health Policy Forum. I have written specifically about improving prison safety by holding prison staff accountable to rules and laws in Washington University Journal of Law and Policy in my article titled "Improving Prison Safety: Breaking the Code of Silence."[2]

9.      My experience as a Commissioner for the Massachusetts Department of Correction and in other leadership roles within the agency, my educational background in policy, and my various consulting roles, positions me to provide

---

[1] Stan Stojkovic, David B. Kalinich, and John Klofas, *Criminal Justice Organizations: Administration and Management* (2008).

[2] Kathleen M. Dennehy and Kelly A. Nantel, *Improving Prison Safety: Breaking the Code of Silence*, 22 Wash. U. J. L. & Pol'y 175 (2006).

Dennehy Decl. - 6

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
P.O. BOX 2728
SEATTLE, WA 98111
(206) 624-2184

expert commentary on the safety risks and potential impact of the Washington State Department of Corrections' release of sensitive and confidential information regarding the identities and circumstances of currently and previously incarcerated transgender, intersex, and non-binary prisoners. My observations are founded on my collective forty-four years of experience as a corrections practitioner, administrator, and consultant. I am also drawing from my experience as a trainer; experience having supervised investigations; knowledge of gender responsive and trauma-informed correctional settings for women offenders; experience with policy development and implementation; and an understanding of nationally accepted correctional practices.

10.    I was requested by attorneys representing currently and formerly incarcerated people in the Washington State Department of Corrections to identify any concerns that might arise from disclosing the identities of and certain other information about transgender, intersex, and non-binary people who are or have been in DOC custody. My CV is attached hereto.

11.    To form this opinion, I looked at a few DOC memoranda, documents and sample forms, such as 490.700 Transgender, Intersex, and/or Gender Non-Conforming Housing and Supervision; 490.800 Prison Rape Elimination Act (PREA) Prevention and Reporting; 490.820 Prison Rape Elimination Act (PREA)

Dennehy Decl. - 7

Risk Assessments and Assignments; 490.850 Prison Rape Elimination Act (PREA) Response; 490.860 Prison Rape Elimination Act (PREA) Investigation; Form 02-384 Protocol for the Housing of Transgender and Intersex Offenders; Form 02-385 Housing Review For Transgender, Intersex, And Gender Non-Conforming Individuals; Form 02-420 Preferences Request; Form 02-422 Transgender, Intersex, and Gender Non-Conforming Housing Multi-Disciplinary Team; and Form 07-019 PREA Risk Assessment Questionnaire.

12.    After looking at these policies and examples of the forms and type of information that may be released publicly, it is my professional opinion that the release of such sensitive and confidential information will 1) increase the risk of sexual abuse of those identified and 2) create additional and avoidable security issues for the DOC. I believe release of this information will exacerbate the vulnerability of transgender, intersex, and non-binary prisoners to sexual abuse. Homophobia and transphobia pervade the correctional culture, so it is vital that lesbian, gay, bi-sexual, transgender, and intersex (LGBTI) inmates are protected.

13.    To provide context, I will first briefly describe the problem of prison rape, the history of the Prison Rape Elimination Act (PREA) of 2003, a description of sub-groups of prisoners who are known to be at increased risk of sexual victimization, and I will identify other security concerns.

Dennehy Decl. - 8

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
P.O. BOX 2728
SEATTLE, WA 98111
(206) 624-2184

14.    For those in custody, one of the collateral consequences of incarceration is an increased risk of sexual victimization by either staff or other inmates. Correctional administrators regularly confront the problem of inmate-on-inmate and staff-on-inmate forced sexual compliance in the institutions they manage. In a carceral environment, victims can neither hide nor escape from their perpetrators and are dependent upon correctional staff to intervene, support and protect them.[3] In correctional settings, the power dynamic is heavily weighted against those imprisoned.

15.    Rape and any form of sexual abuse are reprehensible in any setting, but they are particularly damaging to victims held in custodial facilities having organizational cultures and sub-cultures which have long viewed prison rape as an expected, collateral consequence of incarceration.[4] Society-at-large has been willing to ignore or tacitly accept prisoner rape as punishment one expects in

---

[3] Stephen Donaldson, *Rape trauma syndrome in male prisoners*, Just Detention International, 1994.

[4] Gordon James Knowles, *Male Prison Rape: A Search for Causation and Prevention*, 38 Howard J. of Crim. Just. 267 (1999).

Dennehy Decl. - 9

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
P.O. Box 2728
SEATTLE, WA 98111
(206) 624-2184

prison.[5] Or society believes that "[i]t's too bad such rapes occur, but there's nothing we can do about it".[6] Offenders are often afraid to report abuse out of fear of not being believed and being retaliated against by staff or other inmates.

16.    Prison sexual abuse has the potential to devastate the lives of all victims, who may struggle with long lasting psychological effects including anxiety, depression, alienation, isolation, hostility, helplessness, and mistrust of others.[7] These victims may also manifest physical symptoms as a result of this resulting trauma, such as insomnia, chronic pain, and disturbed sleeping and eating patterns.[8]

---

[5] Cindy Struckman-Johnson, Dave Struckman-Johnson, *Stopping prison rape: the evolution of standards recommended by PREA's National Prison Rape Elimination Commission*, 93 Prison J, 335 (2013).

[6] Alice Ristroph, *Prison and Punishment: Sexual Punishments*, 15 Colum. J. Gender & L. 139, 140 (2006).

[7] Robert Dumond & Doris Dumond, *The treatment of sexual assault victims*, *in* Prison sex: Practice and policy 67–87 (Christopher Hensley, 2002).

[8] Marry Koss & Mary Harvey, *The rape victim: Clinical and community interventions* (1991).

Dennehy Decl. - 10

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
P.O. Box 2728
SEATTLE, WA 98111
(206) 624-2184

17.     Prison sexual abuse takes its toll on the victims, family and friends of victims, witnesses, other inmates, correctional staff members, taxpayers, and the community at large. The abuse renders a correctional environment less safe for both inmates and staff, costs taxpayer money, and undermines the rehabilitation goals of the correctional setting.

18.     PREA was passed with unanimous consent of the 108th Congress and was signed into law by President George W. Bush on September 4, 2003. PREA directed the U.S. Attorney General to promulgate regulations to establish national standards to address prison rape in incarcerated settings. In summary, the stated, multipronged goals of the statute are to: establish a zero tolerance standard for sexual assault of any kind within federal, state and local correctional and detention settings; make the prevention of prison rape a top priority in each prison system; develop and implement national standards for the detection, prevention, reduction, and punishment of prison rape; increase the available data and information on the incidence of prison rape, consequently improving the management and administration of correctional facilities; standardize the definitions used for collecting data on the incidence of prison rape; increase the accountability of prison officials who fail to detect, prevent, reduce, and punish prison rape; protect the Eighth Amendment rights of federal, state, and local prisoners; increase the

Dennehy Decl. - 11

efficiency and effectiveness of federal expenditures through grant programs such as those dealing with health care; mental health care; disease prevention; crime prevention; investigation, and prosecution; prison construction, maintenance, and operation; race relations; poverty; unemployment; and homelessness; prohibit correctional accreditation organizations from receiving federal grant funds until they adopt the PREA standards; and the PREA established the nine member National Prison Rape Elimination Commission (hereafter the Commission), a bipartisan federal commission to conduct a comprehensive study of the penal, physical, mental, medical, social, and economic impacts of prison sexual assaults on individuals, communities and social institutions and to recommend national standards for enhancing the detention, prevention, reduction and punishment of prison rape to the A.G. and the U.S. Secretary of Health and Human Services. The PREA's requirements apply to all federal and state prisons, jails, community corrections facilities, juvenile facilities, police lockups, private correctional facilities, and immigration detention facilities.

19.    To date, most of the research on rape behind bars has focused on establishing the incidence and prevalence of this abuse and identifying individual or organizational characteristics that are predictive of prison rape. Research indicates there are characteristics that are predictive of an inmate being at

Dennehy Decl. - 12

heightened risk of victimization. These characteristics include feminine characteristics, younger age, being perceived as weak or fearful, entering prison for the first time, having previously committed a sexual offense, or being of small stature.[9] Research has also documented the increased vulnerability of men and women with non-heterosexual orientations and transgender individuals.[10]

20.    Certain sub-groups of victims are particularly vulnerable to prison sexual abuse and its effects. For a younger inmate or those with a pre-existing

---

[9] Nobuhle Chonco, *Sexual Assaults Among Male Inmates: A Descriptive Study*, 69 Prison J. 72, 1989; Christopher Man & John Cronan, *Forecasting sexual abuse in prison: The prison subculture of masculinity as a backdrop for "deliberate indifference"* 92 J. Crim. L. & Criminology 127, 157 (2002); Richard Tewksbury, *Fear of Sexual Assault in Prison Inmates*, 69 Prison J., 62 (1989).

[10]  Valerie Jenness et. al., *Accomplishing the Difficult but Not Impossible: Collecting Self-Report Data on Inmate-on-Inmate Sexual Assault in Prison*, 21 Crim. Just. Pol'y Rev. 3 (2010).

Dennehy Decl. - 13

**AMERICAN CIVIL LIBERTIES UNION OF WASHINGTON FOUNDATION**
P.O. Box 2728
SEATTLE, WA 98111
(206) 624-2184

history of mental illness or trauma, the consequences may be worsened.[11] Inmates with mental illness have been identified as being at an increased risk for sexual assault. It is estimated that twelve to thirteen percent of prison rape allegations involve an inmate with a mental illness or an intellectual limitation, which is eight times the proportion for the general inmate population.[12] In recognition of their increased risk of sexual victimization, the PREA standards address the unique needs of certain subgroups of prisoners, including LGBTI, youthful or young-looking offenders, women and juvenile offenders, and those who are limited English proficient (LEP), deaf, blind, or disabled.

21.     In my experience, correctional administrators are well aware that transgender individuals are at increased risk of victimization while incarcerated.

22.     In 2014, Bureau of Justice Statistics provided estimates of the rates of sexual victimization among transgender adult inmates and found that an estimated

---

[11] Robert Dumond, *Confronting America's most ignored crime problem: The Prison Rape Elimination Act of 2003*, 31 J. Am. Acad. of Psychiatry & L., 354, 356 (2003).

[12] NATIONAL PRISON RAPE ELIMINATION COMMISSION REPORT, June 2009, *available at* https://www.ojp.gov/pdffiles1/226680.pdf.

Dennehy Decl. - 14

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
P.O. BOX 2728
SEATTLE, WA 98111
(206) 624-2184

35 percent of transgender prison inmates and 34 percent of transgender jail inmates reported experiencing one or more incidents of sexual victimization by another inmate or correction staff and that a total of 72 percent of transgender prison and jail inmates combined reported experiencing force or threat of force while 29 percent of prison and jail inmates combined reported having been physically injured during the sexual victimization.[13]

23.    Based upon these data, it is clear transgender individuals face significantly higher rates of sexual victimization during incarceration. As such, establishing and enforcing policy and practice that prevent sexual abuse is critically important.

24.    The PREA standards established requirements and criteria for screening all inmates during intake and at subsequent intervals for risk of sexual victimization and abusiveness and described how this information was to be used to inform housing, bed, work, education, and program assignments. The

---

[13] Bureau of Justice Statistics, *Sexual Victimization in Prisons and Jails Reported by Inmates 2011-12*, *Supplemental Tables: Prevalence of Sexual Victimization Among Transgender Adult Inmates*, *available at* https://www.bjs.gov/content/pub/pdf/svpjri1112_st.pdf.

Dennehy Decl. - 15

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
P.O. BOX 2728
SEATTLE, WA 98111
(206) 624-2184

Washington DOC has developed a number of policies and forms to operationalize these requirements and protect vulnerable people in custody from harm.

25.    Because transgender prisoners typically experience a higher incidence of sexual victimization prior to incarceration, subjecting them to constant fear of sexual abuse and repeated sexual harassment is particularly injurious. During intake screening, inmates are asked about prior sexual victimization and abusiveness so that staff can assess the inmate's risk of victimization and utilize such an assessment when making housing determinations, as well as make appropriate treatment referrals. The toxic, sexualized environment of some correctional facilities increases the emotional harm inflicted on prisoners and reinforces the cycle of abuse. The abuse renders a correctional environment less safe for both inmates and staff, costs taxpayer money, and undermines the rehabilitation goals of a correctional setting. Given these consequences, it is imperative that documents containing confidential and sensitive information not be disclosed to the public.

26.    Some transgender, intersex, and non-binary individuals elect not to disclose their gender identity to staff or other prisoners for fear that they will be assaulted or harassed due to their gender identity or that they will become a target for sexual violence. In addition, prisoners fear that correction officials will place

Dennehy Decl. - 16

them in involuntary segregation as a protective strategy. This is especially intimidating for offenders facing long periods of incarceration, as it will limit their access to rehabilitative programs, education, and work assignments. This can result in under reporting of sexual abuse allegations, thereby defeating the very purpose of the PREA statute.

27.    While some transgender, intersex, and non-binary individuals may never disclose their status to anyone while in custody, some individuals may disclose only in the course of participating in PREA risk assessments or housing protocols that are specifically aimed at managing the safety risks inherent for a transgender, intersex, and/or non-binary individual in custody. Others may disclose to individual mental health, medical, or custody staff that they feel safe to confide in but choose to not disclose their status more broadly because of safety concerns. Prisons may possess records, such as medical records, that identify certain individuals as transgender, intersex, and/or non-binary and yet those individuals may not have disclosed this information to their incarcerated peers, prison staff they interact with on a daily basis, or family or friends in the community.

28.    The release of PREA-related records like PREA Risk Assessments and housing review forms, and other documents describing inmates' transgender,

Dennehy Decl. - 17

intersex, and non-binary status will create unintended security risks for the facilities and increased personal safety risks for the prisoners.

29.    The release of records like Form 02-384 Protocol for the Housing of Transgender and Intersex Offenders; Form 02-385 Housing Review For Transgender, Intersex, And Gender Non-Conforming Individuals; Form 02-420 Preferences Request; Form 02-422 Transgender, Intersex, and Gender Non-Conforming Housing Multi-Disciplinary Team; and Form 07-019 PREA Risk Assessment Questionnaire would disclose sensitive and confidential information. Confidentiality provisions exist to encourage inmates to disclose information that they might not otherwise disclose, which is necessary for investigations, intelligence gathering, and managing the security and safety of those in custody.

30.    For all of these reasons, the DOC policies I have looked at contain numerous requirements that information related to PREA be kept confidential or on a need-to-know basis. For example, DOC Policy 490.700 "Transgender, Intersex, and/or Gender Non-Conforming Housing and Supervision" requires that the "record of transgender intersex, and/or gender non-conforming individuals be maintained by the statewide PREA coordinator "in a secure imagining system." Further, "an individual's sexual orientation, gender expression/transition status, intersex status, or gender identity will be maintained as confidential and will only

Dennehy Decl. - 18

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
P.O. BOX 2728
SEATTLE, WA 98111
(206) 624-2184

be disclosed on a need to know basis." Employees that learn of such information are required to report the information "confidentially" to a superior. The DOC's 490.820 Prison Rape Elimination Act (PREA) Risk Assessments and Assignments policy reiterate these requirements that staff treat the disclosure of transgender or intersex status as confidential, as well as note that housing reviews for individuals involve certain staff meeting with the individual "in a location where confidentiality can be maintained…" The release of any records that undermine the confidentiality provisions as outlined in DOC's PREA policies is problematic. Public identification of a transgender, intersex, or non-binary individual in custody, in effect, puts a target on their backs. There is a compelling interest against disclosure of such information.

31.    When an inmate is admitted to a correctional facility, staff have many tasks that must be accomplished prior to placement and assignment. Many facilities immediately provide inmates with some notice of their basic rights to be free from sexual abuse and basic information as to who to contact should they encounter issues. Transgender, intersex, and non-binary prisoners are put in a difficult position wherein they are required to disclose their status in order to receive heightened safety reviews, and to also access accommodations such as gender-affirming clothing and medical care, which they need to live their lives with dignity

Dennehy Decl. - 19

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
P.O. BOX 2728
SEATTLE, WA 98111
(206) 624-2184

and reduce their risk of gender dysphoria and other harms that can arise from not accessing gender-affirming care. Other transgender, intersex, and non-binary people may find safety in being under the radar and not being known by other individuals as being transgender. Publicizing this information puts their safety and the safety of the institution at risk.

32.    However, it is not clear whether Washington DOC advises inmates about the extent of the public disclosure requirements and may not be advised that whatever they disclose during a screening process, or at other times, to determine risk of sexual abuse or what accommodations are necessary for the individual to live according to their gender identity, could be released to the public. This is a particularly sensitive issue because some individuals have not shared their gender identity with family and friends. In addition to creating additional security risks, the release of this information is, in my opinion, a violation of privacy.

33.    For example, the Washington DOC's Preferences Request document asks whether inmates identify as transgender, intersex, or gender non-conforming. Respondents are also asked if they want to keep this information confidential from other individuals. This query is meaningless if the information will be publicly disclosed. Respondents reading this form may elect to provide information that they otherwise would not because they are relying on DOC's apparent blanket offer

Dennehy Decl. - 20

to keep such information confidential, as well as multiple policies that provide that such information will be kept confidential.

34.    Several forms or categories of private information would raise security and safety issues if released. For example, DOC's Protocol for the Housing of Transgender and Intersex Offenders contains information such as medical and mental health needs, history of victimhood, the likelihood of the inmate being abused in different housing options, whether the inmate has been issued certain undergarments, and what shower arrangements are in place for the inmate. Disclosure of this information attached with the name of the inmate would publicize their transgender or intersex status and individual risk factors for victimization, risking the safety of the inmate and the institution. Other sensitive information included in PREA risk assessments and DOC's Housing Protocol forms include past carceral sexual abuse, the inmate's sexual orientation or their perceived sexual orientation, the transgender or intersex or gender non-conforming identity of the individual, their mental health information, medical health information, disability status, and past sexual abuse victimhood. Disclosure of this sensitive information violates their privacy and also puts inmates at risk.

35.    The disclosure of mental health information raises safety concerns as it publicizes confidential information, thereby breaking DOC's policy. DOC's

Dennehy Decl. - 21

Policy 490.700, Transgender, Intersex, and/or Gender Non-conforming Housing and Supervision specifically states an individual's sexual orientation, gender expression/transition status, intersex status, or gender identity will be maintained as confidential and will only be disclosed on a need-to-know basis.

36.    It appears inmates who willingly self-disclose their status are misled to understand this information is kept confidential by the DOC. The reneging of this commitment of confidentiality is especially problematic for those who have a Diagnostic Statistic Manual of Mental Disorders (DMS-5) diagnosis of gender dysphoria, which results from clinically significant distress or impairment in social, occupational, or other important areas of functioning. While paperwork may not directly identify a mental health diagnosis of gender dysphoria, it can be reasonably inferred by those in receipt of the details contained in DOC reports. For example, DOC Form 02-384: Housing Protocol for Transgender, Intersex, and Gender Nonconforming Individuals states, "An official diagnosis of Gender Dysphoria (GD)/Gender Identity Disorder is required for consideration of opposite gender housing options." Records detailing the DOC's consideration of a transfer of an individual to opposite gender housing then outs an individual as having been diagnosed with Gender Dysphoria under the DSM-5.

Dennehy Decl. - 22

37.    In my strong opinion, the release of sensitive and confidential information relative to an individual's gender identity, sexual orientation, medical and mental health care, risk assessment, or history of sexual abuse are counter-productive to creating an environment where inmates will truthfully participate in risk screening, medical and mental health care, or file allegations of sexual abuse. The release of this type of information undermines the intent and effectiveness of the PREA statute and is contrary to basic safety and security principles. The release of any investigations, complaints, grievances, safety assessments, or other information relative to gender identity invades privacy, indirectly or directly discloses a prisoner's confidential medical and mental health status, discourages prisoners from disclosing their gender identity, and discourages the disclosure of perpetrators' identities out of fear of retaliation. It also provides information that other prisoners and staff may use to target transgender, intersex, and non-binary prisoners for violence and harassment.

Dennehy Decl. - 23

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
P.O. BOX 2728
SEATTLE, WA 98111
(206) 624-2184

1

2

3
Executed this 6 day of April, 2021.

4
I declare under penalty of perjury under the laws of the United States and

5
the State of Washington that the foregoing is true and correct.

6

7
By: _Kathleen Dennehy Fay_

8
Kathleen Dennehy-Fay, Ph.D.
Correctional Consultant

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Dennehy Decl. - 24 of 24

# Kathleen M. Dennehy Ph.D.

P.O. Box 95
Wrentham, MA 02093
Cell: 508-509-6699
kaydennehy@comcast.net

| | |
|---|---|
| **EDUCATION & ACADEMIC AWARDS:** | **Brandeis University,** Waltham, MA<br>Heller School for Social Policy and Management<br>Ph.D. in Social Policy, 2020 |
| | **Brandeis University,** Waltham, MA<br>Heller School for Social Policy and Management<br>Master of Arts in Social Policy, 2011 |
| | **Wheaton College,** Norton, MA<br>Doctorate of Laws, *Honoris Causa*, 2006<br>Presented in recognition of work on behalf of mentally ill prisoners<br>Wheaton Distinguished Fellow, 2004-2005 |
| | **Suffolk University**, Sawyer School of Management, Boston, MA<br>Master in Public Administration, 1984<br>Elected to *PI  ALPHA  ALPHA* |
| | **Wheaton College,** Norton, MA<br>Bachelor of Arts – *Magna Cum Laude*. Major: Government, 1976<br>Elected to *PHI BETA KAPPA*<br>Awarded  Government Department Academic Prize at Commencement |

**EMPLOYMENT:**    <u>**CRIMINAL JUSTICE AGENCIES**</u>

**2018-Present**    **EXPERT WITNESS**
Serving as an expert witness for plaintiffs alleging sexual abuse and sexual harassment while incarcerated.

**2016-Present**    **INDEPENDENT FEDERAL COURT**
**SETTLEMENT AGREEMENT MONITOR**
Serving as the Independent Court Monitor of the Settlement Agreement between the United States Department of Justice, the State of Alabama, and the Alabama Department of Corrections resolving the United States' findings of unconstitutional conditions of confinement of women prisoners at the Julia Tutwiler Prison for Women due to sexual abuse and sexual harassment. Providing technical assistance and support in the development of gender responsive and trauma informed policy, practice and programs.

**2010-2016**    **NATIONAL COUNCIL ON CRIME & DELINQUENCY**
**OAKLAND, CA**
SENIOR PROGRAM SPECIALIST
Provided technical assistance to the National Resource Center for the Elimination of Prison Rape (PREA) operated under cooperative agreement with the Bureau of Justice Assistance.  Provided coaching support to Department of Justice (DOJ)  PREA demonstration grant sites and assisted in  the development of DOJ grant award performance measurements. Participated as faculty member for DOJ-certified PREA Auditor training program.

**Resume of Kathleen M. Dennehy - Page 2**

| | |
|---|---|
| **2007-2008** | **BRISTOL COUNTY, MASSACHUSETTS** |
| | **BRISTOL COUNTY SHERIFF'S OFFICE** |
| | SUPERINTENDENT, SECURITY OPERATIONS |

Chief Operations Officer for the overall security of six correctional facilities including: three adult jails/ houses of correction, an Immigration and Customs Enforcement (ICE) Detention Facility, a co-ed juvenile alternative lock-up and a co-ed adult regional police lock-up.

**1976-2007**    **COMMONWEALTH OF MASSACHUSETTS**
**DEPARTMENT OF CORRECTION**

**April 2004 -**    COMMISSIONER
**May 2007**    Chief Executive Officer responsible for the overall management of a statewide public safety agency of eighteen adult correctional facilities with an operating budget of $480 million, a census of 11,000+ inmates, a total of 5,500 employees and 1,000+ volunteers. While achieving system-wide national accreditation status by the American Correctional Association, led the implementation of the Governor's Commission on Corrections Reform recommendations, including the development of new inmate classification, disciplinary, grievance and investigations systems and an agency-wide performance measurement system. E x-officio member of the Governor's Interagency Council on Housing and Homelessness; Interagency Council on Substance Abuse and Prevention; Integrated Criminal Justice Information Systems Council; Advisory Committee on Chaplains in State Institutions and the FBI Boston Joint Terrorism Task Force.

**December 2003-**    ACTING COMMISSIONER
**April 2004**    Appointed as Acting Chief Executive Officer at the peak of public and political reaction to a high profile critical incident. Developed a plan to lead and sustain organizational cultural change, enhance agency transparency and establish focus on system and individual performance and accountability.

**August 1997-**    DEPUTY COMMISSIONER
**December 2003**    As second in command of agency, responsible for strategic planning and implementation for priority projects including achieving accreditation of Bridgewater State Hospital by the Joint Commission on Accreditation for Healthcare Organizations (JCAHO); establishing and sustaining interagency workgroups with the Department of Mental Health, resulting in the formation of Forensic Transition Teams to support successful offender reentry; coordinating DNA sampling of 14,000+ incarcerated offenders in response to emergency legislation and creating a Female Offender Division.

**September 1994-**    ASSOCIATE COMMISSIONER
**August 1997**    As a member of the executive staff, monitored compliance of a statewide $40 million privatized, performance-based, inmate medical, mental health care contract. All sites awarded accreditation by the National Commission on Correctional Health Care. Provided oversight of all inmate programming, including reentry and substance use disorder treatment.

Resume of Kathleen M. Dennehy - Page 3

| | |
|---|---|
| **January 1992-**<br>**September 1994** | SUPERINTENDENT, MCI-FRAMINGHAM<br>Served as the Chief Operating Officer for overall organization, direction and leadership of the state's sole women's prison, a multiple security level correctional complex. |
| **September 1989-**<br>**January 1992** | DIRECTOR, DIVISION OF STAFF DEVELOPMENT<br>Developed and implemented first ever agency-wide annual training plan for 5,000+ employees. Coordinated Correction Officers' Academy training at height of agency's capital expansion. Initiated pre-employment psychological screening process. |
| **June 1987-**<br>**September 1989** | DIRECTOR OF PERSONNEL AND TRAINING, OLD COLONY CORRECTIONAL CENTER<br>As a member of a six person activation team, responsible for the recruitment, hiring and training of the facility's initial 350+ staff members. Oversaw institution's initial accreditation by the American Correctional Association. Served as liaison to staff unions. |
| June 1976-<br>**September 1989** | **SUPERVISORY POSITIONS AT MCI-CEDAR JUNCTION,** THE STATE PRISON FOR MEN; MCI-CONCORD, THE RECEPTION CENTER FOR MEN; AND CENTRAL OFFICE. |

*1996-Present*    ___CONSULTANT ACTIVITIES___

| | |
|---|---|
| **2012-**<br>**Present** | **DEPARTMENT OF JUSTICE, OFFICE OF JUSTICE PROGRAMS, BUREAU OF JUSTICE, WASHINGTON, DC**<br>Subcontracted to conduct peer review of competitive grant applications in the subject areas of Justice Reinvestment, Second Chance, Recidivism Reduction and Prison Rape Elimination Act (PREA) programming. |
| **2017-**<br>**2020** | **A.T. KEARNEY, BOSTON, MA**<br>Subcontracted to provide management consulting services to support reorganization of correctional system in the United Arab Emirates. |
| **2017-**<br>**2018** | **IMPACT JUSTICE, OAKLAND, CA**<br>Contracted to conduct reviews of Prison Rape Elimination Act (PREA) mini-grant applications for the PREA Resource Center and to participate in post review process. |
| **2016-**<br>**2017** | **JUST DETENTION INTERNATIONAL, LOS ANGELES, CA**<br>Providing feedback on program documents, developing curriculum, and participating in training sessions. |
| **2015** | **MASSACHUSETTS HEALTH POLICY FORUM  COUNCIL ON HEALTH CARE ECONOMICS AND POLICY, WALTHAM, MA**<br>Subcontracted as a corrections expert to assist in the development and presentation of research findings on improving access to substance use disorder treatment and reducing incarceration and recidivism. |

Resume of Kathleen M. Dennehy - Page 4

| | |
|---|---|
| **2015** | **CRIMINAL JUSTICE INSTITUTE, INC. HAGERSTOWN, MD**<br>As a member of a team of practitioners and academics, conducted a review and evaluation of the organizational culture of a women's state prison in a New England state. |
| **2014** | **CALIFORNIA DEPARTMENT OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, SACRAMENTO, CA**<br>Contracted as an expert witness in litigation against the California Department of Corrections and Rehabilitation. |
| **2014** | **BETHANY HOUSE MINISTRIES RE-ENTRY SERVICES, MILLIS, MA.**<br>Assisted this non-profit organization with strategic planning and program implementation. |
| **2013** | **BRANDEIS UNIVERSITY, HELLER SCHOOL FOR SOCIAL POLICY AND MANAGEMENT, WALTHAM, MA**<br>Subcontracted as a corrections expert to provide assistance in the development of a "white paper" for the Open Society Foundation on treatment options at the intersection of the criminal justice and substance abuse treatment fields. |
| **2012** | **MONITOR QUEST, LONDON, ENGLAND**<br>As a subcontractor, provided technical assistance to a pharmaceutical company expanding their involvement in the provision of substance abuse treatment options in prisoner re-entry programs. Registered as an executive branch lobbyist in Massachusetts. |
| **2010** | **ROUTLEDGE PUBLISHING, NEW YORK, NEW YORK**<br>Contracted to conduct peer review of a college textbook on corrections. |
| **2007-2012** | **AMERICAN UNIVERSITY, WASHINGTON COLLEGE OF LAW, PROJECT ON ADDRESSING PRISON RAPE, WASHINGTON, DC**<br>Projects have included developing and instructing training modules for training on Investigating Prison Sexual Assault and operational practice and providing technical assistance in the development of policy guides for correctional agencies |
| **2007-2009** | **VERA INSTITUTE OF JUSTICE, WASHINGTON, DC**<br>Projects included providing subject matter expertise and editorial support to the National Prison Rape Elimination Commission and Vera's Corrections Support and Accountability Project. |
| **2007** | **CENTER FOR INNOVATIVE PUBLIC POLICIES, INC., NAPLES, FLORIDA**<br>Participated as a member of national advisory board that guided the development of 21st century jail workforce recruitment, retention and development strategies. |
| **2002-2007** | **NATIONAL INSTITUTE OF CORRECTIONS (NIC) WASHINGTON, DC**<br>• Participated as subject matter expert at LGBTI Policy Guide Development Meeting, January 2011.<br>• Served as a faculty member for California Judicial Symposium on Public Safety, Sentencing and Corrections, June 2007.<br>• Conducted a Management Review and Assessment of the Maine Department of Corrections, 2007. |

Resume of Kathleen M. Dennehy - Page 5

- Served on the National Comprehensive Parole Strategy Workgroup assembled to develop a future model for Parole Boards, 2007.
- Participated as an Advisory Board member for the development of the Relational Inquiry Tool by the Family Justice Institute, New York, 2006.
- Developed and instructed an "Objective Inmate Classification" training module at NIC's National Training Academy in Longmont, Colorado, 2002.

| | |
|---|---|
| **2001-2002** | **ABT ASSOCIATES, CAMBRIDGE, MA**<br>Provided federally supported technical assistance for the development of a federally funded "Transition from Prison to Community" national prisoner re-entry model. |
| **2000-2002** | **SECURITY RESPONSE TECHNOLOGIES, INC.**<br>**MIDDLETON, MA**<br>Provided federally supported technical assistance to Washington State's Department of Correction during implementation of new Offender Accountability Legislation. |
| **1996-2004** | **AMERICAN CORRECTIONAL**<br>**ASSOCIATION ALEXANDRIA, VIRGINIA**<br>As a certified audit team chairperson and member, coordinated and conducted national accreditation surveys and monitoring visits of prisons and jails. |
| *1999-2009* | ***TEACHING EXPERIENCE*** |
| **2008-2009** | **SUFFOLK UNIVERSITY, SAWYER SCHOOL OF MANAGEMENT**<br>**BOSTON, MA**<br>Developed and instructed a "Policy Analysis and Evaluation" course for the Master in Public Administration Program. |
| **1999-2004** | **CURRY COLLEGE**<br>**MILTON, MA**<br>Developed and instructed a "Contemporary Issues in Correctional Administration" **course for the Master in Criminal Justice Program.** |
| **2003** | **BRISTOL COMMUNITY COLLEGE FALL RIVER, MA**<br>Developed and instructed an "Introduction to Corrections" course for undergraduate criminal justice students. |
| *PROFESSIONAL APPOINTMENTS, BOARD MEMBERSHIPS & ACTIVITIES* | **MASSACHUSETTS CRIMINAL JUSTICE REFORM COALITION**<br>Invited member of a Boston- based, diverse group of prosecutors and corrections practitioners, defense attorneys, community organizers and businessmen and women working with lawmakers to make major changes in the state's criminal justice system.<br>Term: 2012-present.<br><br>**MASSACHUSETTS ASSOCIATION FOR PROFESSIONAL LAW ENFORCEMENT (MAPLE)**<br>Member, Board of Directors<br>This non-profit organization is committed to improving the professionalism of those who enforce the law.<br>Term: 2019-Present |

Resume of Kathleen M. Dennehy- Page 6

**LIONHEART FOUNDATION, BOSTON, MA**
Member:  Board of Directors
This non-profit organization is dedicated to providing social emotional learning programs to incarcerated adults, youth at risk, and teen parents in order to significantly alter their life course.
Term :  2019-Present

**NATIONAL FORENSIC SCIENCE TECHNOLOGY CENTER, LARGO, FLORIDA**
Member , Board of Directors
This center supports law enforcement, forensic scientists, and military personnel with forensic training and consulting, lab assessments, and technology
Term: 2013-2017.

**THE PIONEER INSTITUTE,  BOSTON, MA**
Served as a judge in this non-profit's 2016 Better Government Competition, an annual  citizens' idea contest that seeks out and rewards innovative public policy proposals. The Institute sought proposals to improve quality and access to care for individuals living with mental illness though innovative approaches to insurance, healthcare, human services and partnerships between government agencies and mental health providers.
Term: 2016.

**THE MASSACHUSETTS SUPREME JUDICIAL COURT TASK FORCE ON HIRING IN THE JUDICIAL BRANCH**
Invited member of a taskforce convened by the Chief Justice in the wake of a "pay-to-play" patronage scandal in the judiciary's Probation Dept. Task force produced a blueprint for reform of system.
Term: 2011-2013.

**VENTURING OUT, INC.**
Member,  Board of Directors
Venturing Out's mission is to improve economic self-sufficiency outcomes for high- risk and court-involved populations .
Term: 2012-2014.

**ASSOCIATION OF WOMEN EXECUTIVES IN CORRECTIONS**
Founding member and former 10 year member of National Board of Directors Currently serving on the Association's National Voice and Research Committees Term: 2002-2016.

**NATIONAL COMMISSION ON ACCREDITATION FOR CORRECTIONS**
Elected to represent the Association of  State Correctional Administrators
Term: 2004-2008.

**CORRECTIONAL ASSOCIATION OF MASSACHUSETTS**
Elected to the Board of  Governors
Term: 1998-2008.

*PROFESSIONAL AWARDS:*

*Susan Hunter Award*
Association of Women Executives in Corrections, November 2007.

Dennehy Decl. - 30

Resume of Kathleen M. Dennehy - Page 7

*Annual Leadership Award*
Massachusetts Office for Victim Assistance, April 2007.

*Voices Against Violence Award*
South Middlesex Opportunity Council, May 2005.

*Outstanding Alumni Award*
Dedham High School, May 2005.

*Jim Justice Award for Professional Excellence*
Correctional Association of Massachusetts, May 2002.

*Breaking the Glass Ceiling Award*
National Center for Women and Policing, April 2002.

*Faces to Watch Award*
Boston Magazine, 1993.

*Governor's Pride and Performance Award*
Commonwealth of Massachusetts, 1984.

*PRESENTATIONS*   **Massachusetts Legislature, Boston, MA**
Participant in Panel discussion endorsing the "Raise the Age"
initiative, November 2019.

**Harvard  Medical School, Center  for Bioethics, Cambridge, MA**
Participated in a panel discussion at the *"Behind Bars: Ethics and Human Rights in US Prisons Conference"*  about human rights and health issues impacting the  incarcerated LBGTI population, November 2017.

**Massachusetts Association of Women in Law Enforcement, Boston, MA** Presented a workshop o*n "Lessons Learned, Moving Forward "* at the annual training conference, October 2017.

**Bethany House Prison Ministries, Millis, MA**
Recruited, organized and moderated a panel of legislators, journalists, attorneys, and prison advocates to discuss pending Justice Reinvestment Legislation, October 2017.

**The Center for Church and Prison, Inc., Boston, MA**
Participated in a panel discussion on **"***Death and Dying in US Jails and Prisons"* September 2016.

**Massachusetts Health Policy Forum**, **Boston, MA**
Presented policy brief addressing  access to substance use disorder treatment and reducing incarceration and recidivism in Massachusetts, November 2015.

**Massachusetts Legislature, Boston, MA**
Invited to present commentary on pending legislation at Criminal Justice Expo, November 2015.

Resume of Kathleen M. Dennehy- Page 8

**Rappaport Center, Boston College Law School, Newton, MA**
Participated in a panel discussion entitled "*Safe and Sound: Women Prisoners"* in addressing  conditions in Massachusetts' correctional facilities for women, October 2015.

**Massachusetts Legislature, Boston, MA**
Invited to present "*A Vision for Criminal Justice Reform in MA" ,* to the MA Harm Reduction & Drug Law Reform Caucus, July 2016.

**Just Detention International, Washington, DC**
Invited participant at closed-door discussion of national leaders on the topic of "*Inmate-On-Inmate and Resident-on Resident Sexual Abuse in Women and Girls' Facilities",*  May 27, 2016.

**Just Detention International, Washington, DC**
Invited participant at closed-door discussion of national leaders on the topic of "*Female Staff Sexual Abuse in Detention"*, May 26, 2016.

**Massachusetts Association of Women In Law Enforcement, Boston, MA**
Participated in a panel discussion on the recruitment, retention and promotion of  women in law enforcement, October 2015.

**Pennsylvania Department of Corrections, Elizabethtown, PA**
Invited to participate and present at a forum of national experts to discuss the role of women staff in PREA violations, June 2015.

**MA Prisoner Legal Assistance, Boston, MA**
Invited to provide "*An Overview of PREA"* for legal staff.
June 2015.

**The  Constitution Project, Washington, DC**
Participated in a  panel discussion on conditions in women's prisons moderated by *The Washington Post,* September 2014.

**Suffolk University, The Center for Restorative Justice, Boston, MA**
Participated in a  panel discussion of "*Healing after Crime: Exploring the Promise of Victim-Offender Dialogue in the Wake of Serious Crime",* May 2012.

**Massachusetts Legislature, Boston, MA**
Participated in a  panel discussion of "*Briefing on Impact of Proposed Three Strikes Sentencing Bill"* for the MA Black and Latino Legislative Caucus , March 2012.

**Middlesex Community College, Lowell, MA**
Participated in a panel  discussion of "*Should there be a three-strikes law in Massachusetts?"* at a Lowell Community Forum, February 2012.

**Stonehill College, The Martin Institute for Interdisciplinary Studies, Easton, MA**
Participated in a panel  discussion of *"The Power of Forgiveness: Freedom and Responsibility",* October 2011.

**Suffolk University Law School, Boston, MA**
Participated in a panel discussion on *"Alternatives to Life without Parole in Massachusetts",* November 2010

Resume of Kathleen M. Dennehy - Page 9

**California Administrative Office of the Courts, Center for Judicial Education and Research, California Judicial Symposium on Public Safety, Sentencing and Corrections** , **Newport Beach, CA**
Participated in a panel discussion of  "*State and Community Corrections Systems",*
June 2007.

**Harvard University,  Rappaport Institute, Kennedy School of Government, Cambridge, MA**
Invited to present on *"The Future of Incarceration in Massachusetts and the Nation",*
February 2007.

**The University of Texas, Lyndon B. Johnson School of Public Affairs** ,
**Austin, TX**
Invited to participate in a panel discussion on "*Opening Up a Closed World: What Constitutes Effective Prison Oversight?"* April 23-26, 2006.

**National Prison Rape Elimination Commission Hearing, Miami , FL**
Provided testimony on prison culture and the need for reform, March 23, 2006.

**Commission on Safety and Abuse in America's Prisons Hearing, St. Louis, MI**
Provided testimony on prison culture and the need for reform, November 1-2, 2005.

**Harvard University, Institute of Politics, Kennedy School of Government, Cambridge, MA**
Invited speaker on *"Women Leaders in Criminal Justice",* March 10, 2005.

**PUBLICATIONS:**    *"Improving Access to Substance Use Disorder Treatment and Reducing Incarceration and Recidivism"* by Brolin, M., Dennehy, K., Booxbaum, A. and  Horgan, C. Waltham, MA: **MA Health Policy Forum,** November 2015.

*"My Thirty Plus Years in Corrections: A Work Perspective*". In **Criminal Justice Organizations**, by Stan Stojkovic et al., pp.10-11. Belmont, CA: Thomson Wadsworth, 2008.

*"A Three-Minute Introduction to the Impact of Sentence and Administrative Sanctions on Female Offenders' Rehabilitation Opportunities".* In **New England Journal on Criminal and Civil Confinement**, Winter 2007, Volume 33, Number 1.

"*Improving Prison Safety: Breaking the Code of Silence".* In **Washington University Journal of Law and Policy**, Volume 22, 2006.

"*Offender Programming: A Smart Investment for Society".* In **Correction's Today**, December 2006.

**TRAINING CERTIFICATES:**    U.S. Government's Defense Information Systems Agency
Cyber Awareness Challenge , March 2015.

Collaborative Institutional Training Initiative (CITI Program) August 2018.